## George F. Fuller v. The State.

### No. 3158.   Decided May 2, 1906.

**1.—Murder in First Degree—Jury and Jury Law—Bill of Exceptions—Question to Juror.**

Upon a trial for murder in the impanelment of the jury, it was improper on the part of the State to ask a juror if he were taken on the jury would he be influenced even in the slightest degree by an appeal to any higher law than the law of the land, or as the law would be charged by the court. However, as no particular prejudice to the defendant's right was set out in his bill of exceptions, there was no error.

**2.—Same—Evidence—Declaration by Defendant—Confession—Warning—Res Gestae.**

On a trial for murder it was error to admit declarations of the defendant to the officer after his arrest, and which referred to a conversation that had previously occurred between them; such declaration being made some time after the homicide (the record not showing how long) and did not relate to the homicide itself or show that the transaction was voicing itself, but was simply a statement by defendant that he had told the officer that he would come to him.

**3.—Same—Evidence—Hearsay—Harmless Error.**

Upon a trial for murder, while it was improper to introduce certain correspondence of the wife of deceased to a third party with refenerce to the property of

deceased without showing any connection of her action and that of defendant, or any knowledge on his part of her conduct, or that he was a party thereto; yet she answered in the negative and favorably to the defendant, the error was harmless.

**4.—Same—Cross-Examination—Want of Chastity.**

Upon a trial for murder the State was not bound by the answer of the wife of the deceased upon cross-examination that she had never surrendered her virtue, and had never had carnal knowledge of any person except deceased; but the State had the right to prove that her reputation for chastity was bad.

**5.—Same—Act of Third Party—Harmless Error.**

Upon a trial for murder while it was improper for the State to prove by the wife of defendant what she did with reference to writing letters to different banks concerning deceased's property, such question was harmless as she answered in the negative.

**6.—Same—Bill of Exceptions—Certificate of Judge.**

It has frequently been held that the statement of a ground of objection in a bill, is not the certificate by the judge that the fact is so, and unless this appears the bill is insufficient, although the testimony admitted and which related to certain transactions of defendant with reference to deceased, was of that character as to make it inadmissible.

**7.—Same—Charge of Court—Approved Form.**

Upon a trial for murder in the first degree where the court's charge was in accordance with the approved form upon the issue of murder in the first degree, there was no error.

**8.—Same—Charge of Court—Manslaughter—Adequate Cause.**

Where upon trial for murder the evidence showed that shortly before the killing a witness told the defendant that deceased had told the witness that he, deceased, did not want his wife to appear against him in his divorce suit that he had brought against her; that he did not want to injure her character, and that he would prove she was pregnant two months before he married her, which statement concerned defendants daughter; it was error upon part of the court to charge that it was a question of fact for the jury to determine from the evidence as to just what the witness told defendant on that occasion, there being no controversy about this statement.

**9.—Same—Adequate Cause—Chastity of Female—Provocation.**

See opinion for discussion of article 704, Penal Code, limiting extent of provocation where insulting language has been used by deceased with reference to female relative of defendant, and as applying to a charge on manslaughter as adequate cause.

**10.—Same—Restrictive Charge—Manslaughter.**

Where upon trial for murder the court in charging upon manslaughter enumerated all the essential elements that must be proved in order to make a case of manslaughter, but omitted to charge affirmatively that if the jury believed the facts in evidence on this issue to convict appellant of manslaughter; and immediately proceeded to tell the jury that if such elements did not arise from the evidence but that the homicide was done from hatred, ill will or revenge, etc., the killing would not be manslaughter; such additional charge as framed put a greater burden on the defendant than the law authorized; in as much as that the court in the first charge quoted, submitted as an issue to the jury that they must find that appellant had been informed of the insulting language concerning the daughter of defendant by deceased, which by the evidence was not controverted, and in the additional charge instructed the jury on the same issue and told them if they believed that the defendant had not been informed or did not believe in good faith that deceased had been guilty of such insulting language and conduct that he could not avail himself of the defense of manslaughter. This charge suggested to the jury that in the mind of the court there was no manslaughter in the case.

**11.—Same—Self-Defense.**

See facts in the opinion which did not authorize a charge on self-defense, as the evidence did not raise this issue.

Appeal from the District Court of Angelina. Tried below before Hon. James I. Perkins.

Appeal from a conviction of murder in the first degree; penalty, imprisonment in the penitentiary for life.

The opinion states the case.

*O'Quinn & Robb,* for appellant.—On the question of self-defense; Phillips v. State, 26 Texas Crim. App., 247; Blocker v. State, 27 id., 16; Nalley v. State, 30 id., 458; Swain v. State, 86 S. W. Rep., 335. On question of adequate cause: Eanes v. State, 10 Texas Crim. App., 446. On question of chastity of female relative of defendant: Jones v. State, 38 Texas Crim. Rep., 100; Greenleaf on Evidence, vol. 1, secs. 445 and 447. On question of manslaughter: Pitts v. State, 29 Texas Crim. App., 374; Martin v. State, 40 Texas Crim. Rep., 660; Messer v. State, 43 id., 97.

*Howard Martin,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the first degree, and his punishment assessed at confinement in the penitentiary for life; hence this appeal.

The State simply proved the killing, and the circumstances immediately connected therewith; and some evidenc of threats by appellant against deceased prior to the killing. The facts connected with the homicide showed that about 12 o'clock on the 27th day of March, 1905, appellant armed with a pistol came up with deceased (Brunsterman), at the Lufkin National Bank in the town of Lufkin. He went into the bank where deceased was, pursued him rapidly through the private office of the bank, then through another office into the vault, where deceased had evidently fled for safety, and there fired two shots at him; the first missing him, and the second taking effect in deceased's ear, ranging down through his head from left to right and coming out at an angle of his jaw, and penetrating his arm, coming out near the elbow. This shot caused his immediate death. Appellant introduced a good deal of testimony tending to show that the killing occurred because of an insult to a female relative, to wit: his daughter. It appears from these facts that deceased had charge of a large orchard, as manager, situated at Manton, near Lufkin. Some months before the homicide appellant was a conductor on the H. E. & W. T. Railway, in Louisiana. His family consisting of his wife and daughter (Lula), and son (Willie), living at Lufkin. Some time during the latter part of 1904, deceased procured the wife of appellant to go on the place he was managing, and keep a boarding house for the hands. Shortly after this appellant was sent for by his wife, and he came and was employed by deceased as foreman of some of the hands at the orchard. Sometime in the latter part of December, and after the parties had been living there two or three weeks, deceased (who took his meals at the

boarding house of the Fullers), began paying attention to Lula, the daughter of appellant, who was seventeen years old. They became engaged to be married, and deceased asked the parents for permission to marry her. They objected on the ground that she was too young, and asked him to wait a year or two. He declined to do this, and stated that as soon as she was eighteen he would marry her any how. They then agreed for them to marry, and it seems the marriage was fixed to occur the latter part of December. About December 21, deceased came one night to appellant's home and told him the marriage was broken off, that he would not marry his daughter. Appellant wanted to know why, but he declined to tell. Deceased on the same evening had told Lula that he had heard some evil reports about her; that she had done wrong, and proposed to her that she be examined by three physicians, and if they said she was all right he would be satisfied, and desired Lula to go to Lufkin and be examined. She told him she would not submit to any such proposition without consulting her father and mother. That if they were willing she would be examined; that she did not fear the result of an examination. After deceased came to appellant that night and told appellant that the marriage was broken off, on the next morning, Lula told her mother what occurred between her and deceased. Appellant sought deceased, and found him at O'Quinn's law office, in Lufkin; and there, in the presence of Dr. Denman demanded to know of deceased why he had broken his engagement with his daughter. Deceased then told him what he had heard about her; that he had been told her character for virtue was not good, and that he had made the proposal to her to be examined by three physicians. The matter was talked over, and appellant agreed with deceased that Dr. Denman (then present), and two other reputable physicians might examine his daughter, and if it was proved that she was unchaste he would get on his knees to him and beg his pardon for what he had said to him the night before. Appellant also undertook to follow up the reports deceased told him about; and made some inquiries of Charley Moore, who told him that he had heard certain other parties making disparaging remarks about his daughter. After this, and before the examination of Lula should have occurred, deceased came again to the house of appellant on the night of December 25th, and told appellant he wanted to marry Lula and did not desire any examination; that he was satisfied the reports he had heard were not true. Appellant objected because the examination had not taken place. The next morning deceased again insisted that he and Lula be married; and it seems they were married on that day. The parties all continued to live on the fruit farm at Manton. After this, about the middle of February, deceased and his wife (Lula), visited Houston and stopped with the family of H. O. Fuller in that city, with whom deceased's wife and her family were acquainted, having become friends when the Fuller family formerly lived in Houston. While on this visit, according to the testimony of Mrs. Brunsterman and Mrs. H. O. Fuller, deceased insisted his wife should go to a doctor in Houston

and let him perform an abortion on her. His wife refused to do this. Whereupon deceased charged her with being pregnant with a bastard child, and stated if she did not permit the abortion he would know it was a bastard, and he did not believe he was the father of the child; and when it was born he would take the little bastard by the heels and slam its brains out against the fence. On the return from Houston to deceased's home, the parties did not get along very well. The wife of deceased testified that about the first of March deceased had determined to quit her, and told her he was going to get a divorce from her; that he had no cause for divorce, and desired her to select some man and he would get him to come and sleep with her, so he might catch him, and then he would sue for a divorce. This she indignantly declined. She told her mother of this matter about the 4th of March, and also what occurred at Houston between her and deceased in the presence of Mrs. H. O. Fuller; and shortly afterwards her mother told appellant about these matters. On March 12th appellant left the fruit farm, moved to Lufkin, where his daughter shortly joined him, having separated from deceased. Appellant's testimony shows that after this he secured employment at Humble, near Houston, and that he had packed his household goods to move to Humble. On March 27th he had started to the depot to see if a car had been placed so he could load his things. On the way appellant met A. J. Vinson, between Richardson's drug store and Anderson's barber shop, and Vinson told him that he had just seen Brunsterman and had a talk with him; that Brunsterman told him he did not want Lula to appear against him in his divorce case against her; that he did not want to expose her; that she was two months gone in pregnancy when he married her. Appellant proved this both by his own testimony and that of Vinson. According to appellant's testimony, everything behind that statement made by Vinson, made him so mad that he did not know what to do; that he went to the depot to see about the car and went from there to his house and got his pistol, and came back down in town to kill Brunsterman; that he saw deceased's horse hitched in front of a store and he stopped to see if he was there. Not seeing him there he turned and met his son Willie, and asked him where he was going, and he replied to the postoffice. Appellant went with him thinking he might see Brunsterman there. Not seeing him he started towards Mantooth's law office thinking Brunsterman might be there. When appellant walked out of the postoffice, Brunsterman was not quite half way from Menefee & Peavey's store to the bank and appellant followed on behind him. Brunsterman was in his shirt sleeves but had on a vest. Appellant says he told Brunsterman as he walked up: " 'I want to see you.' Deceased struck me on my right arm with his hand and broke to run and I followed him up. I went down there, you understand, to kill him; and after me speaking to him, I didn't propose then for him to get behind that door and kill me, and I followed him up. Deceased ran around and run in the door, and then in another door into the main office of the bank and I shot at him,

and I don't know whether I hit him that time or not. He ran into the vault and I followed him to the door, and when I got to the door I shot him again." Appellant narrates the circumstances of the killing about as the witnesses for the State. He says emphatically that he went down there to kill him as soon as Vinson told him what he did; that if he had had a canon he would have blown him off the face of the earth with it; that he supposed it was thirty or forty minutes after Vinson had told him until he killed deceased. On cross-examination appellant stated: " When I spoke to deceased in the bank I intended to ask him if he had made the statement told me by Vinson, and if he said he did, I was going to shoot him down like a dog. If he had denied it, I intended to take him before Vinson, and if Vinson told him to his face that he did say what Vinson told me then I intended to shoot him. I was so enraged that I hardly knew what I was doing. I followed him up after he struck me because I thought he was armed, as I knew he was in the habit of carrying a pistol, and I thought he was trying to get the advantage of me to kill me. He struck me on the right forearm. There was nothing said by Brunsterman and nothing by myself after he struck me and began retreating." This is a summary of the facts upon which appellant relied. The State in rebuttal proved by a number of witnesses the bad character of Lula (daughter of appellant and wife of deceased), for chastity.

By bill of exceptions appellant questioned the action of the court in permitting the district attorney in the empanelment of the jury to propound to them the following question: "If you are taken on the jury to try this case, will you be influenced even in the slightest degree by an appeal to any higher law than the law of the land or the law as will be charged you by the court." This was objected to by appellant, "because it was a suggestion to the jury that they ought to find appellant guilty of murder in the first degree, and did not leave the juror free to act upon his own opinion of the right or wrong of the case, and was not a proper test of the qualification of a juror." The answer of any particular juror is not given; nor are we informed any further as to these bills. We are inclined to believe that this was not a proper question, inasmuch as each juror is sworn to try the case on the law and the evidence developed in the trial, and was in the nature of a suggestion that the jurors would not be governed by their oaths in the matter. However, we do not believe any particular prejudice is shown by this action of the court.

R. V. Watts, sheriff of the county, was permitted to testify over appellants' objection that he was not present at the time of the killing but was in town; that some one told him about the shooting and he at once started to the place where he was informed it had occurred, and after he had gotten to the place and learned defendant was not there he went towards the courthouse, and when he got near to the courthouse he saw the constable R. L. Davis take hold of defendant and was trying to take the pistol that defendant had, and defendant was trying to keep

it," and seeing defendant coming towards him, and when, "I was about ten feet from him, he asked me whether he should give the pistol to Davis, and I told him to do so, which he did; and he then said to me, "Watts, I told you that I would come to you." This testimony was objected to by defendant at the time because it did not appear that defendant who was under arrest at the time, had been warned by any person that any statement made by him could be used against him in the trial of case; and further it was not res gestæ; that the testimony was especially calculated to damage appellant by reason of the fact that Watts had testified that defendant in a conversation with him, prior to the homicide, had told him if he (defendant), ever killed deceased he would came to him (Watts). The testimony shows that deceased had, sometime prior to this, had a conversation with Watts as to the trouble between him and defendant, and defendant was then talking with Watts as to his, Watts', conversation with deceased. It does appear here that appellant was under arrest at the time and it does not appear that any warning was given. As to the matter being res gestæ, we are not informed how long after the homicide it may have occurred. Evidently from the relation of the facts here, it occurred sometime after that event; but the expression does not appear to relate to the homicide itself, or show that the transaction was voicing itself. It is merely the reiteration by appellant to the sheriff and refers to a conversation that had previously occurred between them. We do not believe it could be said that it comes under a res gestæ statement, either in point of time, or the transaction was voicing itself, and should not have been admitted.

We do not believe it was competent to have shown by Mrs. Lula Brunsterman, as was attempted, that she had written or employed O'Quinn & Robb to write a certain bank in Houston after deceased's death with regard to his property, unless some connection had been shown between her action in the premises and defendant; that is, that he had knowledge of her conduct or was a party thereto. However, she answered these questions in the negative, and we cannot see that any particular injury ensued from the questions.

We do not believe the State on cross-examination was bound by the answer of Mrs. Lula Brunsterman, to the effect that she had never surrendered her virtue to any person and had never had carnal knowledge of any person except deceased (her husband). We do not believe that her negative answer prevented the State from proving that her reputation for chastity was bad.

We do not believe it was proper for the State to prove by Mrs. Fuller (appellant's wife) against him, what she did with reference to writing letters to different banks, particularly to the bank at Houston, about deceased's property; unless some connection was shown between her acts and appellant. He could not be bound by what she did, unless he had knowledge thereof and authorized it. However, she answered that she did not.

This bill also shows that the State was permitted to prove the

following facts by said witness, Mrs. Fuller: "Is it not a fact that on the night after deceased had left your and defendant's house (alluding to the night of December 21st, when deceased came there and said he had broken off the marriage with Lula), if defendant did not arm himself and go out and was gone nearly all night searching for deceased?" To which witness answered that if defendant armed himself or was looking for deceased she did not know it; but that he was out a portion of the night. This was objected to on the ground that it was neither pertinent nor germane to matters drawn out in her chief examination, but was collateral and independent matter injurious to defendant. It has frequently been held that the statement of a ground of objection in a bill, is not the certificate by the judge that the fact is so. If the bill in this respect was sufficient to show that the State had not inquired of witness (wife of appellant), anything in regard to the transaction which happened between appellant and deceased on the night of the 21st of December, 1904, and had not inquired with reference to what appellant did thereafter, said testimony would not be competent. If said testimony was not admissible, in our opinion it was of that character calculated to be used by the jury to the injury of appellant; but, as stated, we do not believe the bill is sufficient.

We do not think that the criticism of the court's charge of murder in the first degree is well taken. It is not necessary here to copy the charge, but the definitions appear to be in accordance with the approved forms.

This charge is also objected to by appellant, to wit: "It is a question of fact for you to determine from the evidence *as to just what* the witness, Andrew Vinson, told defendant on the day of, and before the hour of the alleged killing, deceased had said concerning Lula Brunsterman in relation to her being in a state of pregnancy when deceased married her. And if you believe such statement, as you believe was made by Vinson to defendant, amounted to and constituted insulting words toward and concerning said Lula Brunsterman, and, under all the circumstances in evidence as viewed from defendant's standpoint, were calculated to provoke in defendant a feeling, or passion of anger, rage, or sudden resentment towards deceased, you are instructed that in such case such words would constitute 'adequate cause' within the meaning of that term, as used in the definition of manslaughter; and in this connection you are instructed that evidence of the general character of Lula Brunsterman for chastity and virtue may be considered by you in order to ascertain the extent of the provocation. If you find that the killing of deceased (if he was killed) would otherwise be murder, then, in order to reduce such killing to the grade of manslaughter, upon the ground of insulting words or conduct towards a female relation of defendant, the following facts must all concur and have existed:

"1. That deceased was guilty of insulting words and conduct, or either, towards defendant's daughter, Lula Brunsterman, or that de-

fendant had been informed, and in good faith believed, deceased was so guilty.

"2. That he killed deceased the first time he met with him after he, defendant, had been informed of such insulting words of deceased towards or concerning his said daughter, Lula Brunsterman, and in this connection you are instructed that the time intervening between the time defendant was informed of the insulting words and the time of the killing is immaterial: as to the matter of time it is only required that the killing must have been upon the first meeting after information of the insult as communicated by the witness, Vinson, hereinbefore referred to, if you believe the matter so communicated by Vinson was, under the circumstances, insulting; and in this connection you are instructed that in judging and deciding whether the matter so communicated to defendant by Vinson was insulting and calculated to provoke the passion of defendant, you may look to and consider previous insulting words (if any there was) of deceased towards said Lula Brunsterman, notwithstanding the defendant may be shown to have met with deceased after he had been informed of such previous insults, and before the occasion upon which the shooting occurred, and you will also bear in mind that it is immaterial for the purpose of this case, as to whether deceased, Fred Brunsterman, was in fact guilty of such insulting words or conduct, if any, imputed to him and upon information of which defendant claims to have acted; if defendant was informed that he, deceased, was so guilty, and in good faith believed and acted upon such information, it would avail him the same whether deceased had or had not in fact been guilty of such insults.

"3. That such insulting words or conduct by deceased was the real provocation which induced the killing; and,

"4. That when defendant killed deceased, if he did kill him, he was affected by such a degree of anger, rage, resentment or terror as would commonly, in a person of ordinary temper, render the mind incapable of cool reflection."

Appellant excepted to the charge quoted, on the ground that it was incomplete and failed to give defendant the benefit of a reasonable doubt, if any, as to whether the statement of deceased, and repeated to defendant by witness Vinson was insulting words towards defendant's daughter, or as to what the statements were, or whether they were calculated to provoke defendant into a feeling of passion, rage or sudden resentment. In our opinion it was not a matter of controversy as to *just what* the witness Andrew Vinson should have told defendant on the day of and just preceding the homicide. We understand both the testimony of Vinson and of appellant shows that the language used was the same. Both witnesses state distinctly that the language used by deceased to Vinson and conveyed by Vinson to appellant was to the effect, "that he (deceased) did not want her (his wife) to appear against him in his divorce suit that he had brought against her; that he did not want to injure her character; that he would prove she was preg-

nant two months before he married her." To have submitted this issue as to *just what* the witness Andrew Vinson, told defendant, was a suggestion by the court that this was a matter of controversy, whereas we do not so regard it.

We note further in this connection that the court submitted to the jury, "whether or not such language under all the circumstances amounted to adequate cause." Ordinarily the court should have told the jury, if they believed that this language was used, and it was conveyed to appellant, and he believed it was said by deceased, it would constitute adequate cause; because it was a direct imputation on his daughter that she was an unchaste woman. However, the State proved, under article 704, Penal Code, that Lula (wife of deceased and daughter of appellant), was a girl of bad reputation for chastity. We understand this character of testimony to be admissible, as the statute says, "in order to ascertain the extent of the provocation." It may be that in view of this statute, the mere proof of reputation of the alleged injured female would have a bearing upon the question of adequate cause. If so, the court's charge in this connection may be correct. However, it will be observed here that there is no direct proof that appellant knew the reputation of his daughter, save as he might be affected by that reputation, which would perhaps reach him last of all. However, we are not prepared to say that this portion of the charge was erroneous.

The following charge of the court is excepted to: "If on the other hand the defendant had not been informed or did not believe in good faith that deceased had been guilty of such insulting words or conduct towards his daughter, Lula; or if he had been so informed and did so believe and had not met with deceased since being informed of same before and until the occasion of the killing, yet if such insulting words or conduct of deceased towards his said daughter, Lula, was not the real provocation which induced the killing, or if the killing was not committed under the immediate influence of sudden passion, such as hereinbefore has been explained to you, but was done from hatred, ill will or revenge, and in pursuance of a design previously formed when his mind was sedate and deliberate, the killing would not be manslaughter." It will be observed that this charge follows the charge just above quoted. Said first charge is itself restrictive and enumerates all of the essential elements that must be proved in order to make a case of manslaughter. It will be further seen that these are required to be proved before appellant can avail himself of the defense of manslaughter. We further note that this charge nowhere affirmatively tells the jury, if they believe the facts so to be, to convict appellant of manslaughter; but immediately proceeds to tell the jury: "If on the other hand," etc. We believe under the circumstances of this case, that this additional charge of the court as framed, put a greater burden on the defendant than the law authorizes. The court in the first charge quoted presents as an issue to the jury, that they must find, that appellant had been informed of the insulting words, etc.; and in this portion of the

charge, he presents this issue again, and tells the jury if they believe defendant had not been informed, or did not believe in good faith that deceased had been guilty of such insulting words or conduct towards his daughter, etc., he could not avail himself of manslaughter. It does not occur to us, from the record in this case, that there is any controversy as to this matter. The court then again says to the jury, if he had been so informed and did so believe and had not met with deceased since being informed of the same before the homicide, yet if they believe that the same was not the real provocation, appellant cannot avail himself of manslaughter. They had just been told in the preceding charge that in order to avail himself of manslaughter, the jury must believe he acted in good faith on such information, and that such insults were the real provocation which induced the killing. The court then further proceeds to tell the jury that if the killing was done not on account of the insults as a provocation, but from hatred, ill will or revenge, and in pursuance of a design previously formed, when his mind was sedate and deliberate, the killing would not be manslaughter. This, in the connection in which it was used, was calculated to suggest to the jury that in the mind of the court, there was no manslaughter in the case. At any rate, we believe that the charge imposed on appellant a greater burden than the court was authorized to place on him; that under the circumstances detailed in this record, appellant was entitled to have a fair and full charge on his defense of manslaughter. This charge, in the language of appellant's counsel, "was calculated to hold too prominently before the jury all the time and throughout the opposite view of the case." The court first renders the path of defendant to a verdict of manslaughter difficult, by stating all the essential elements that must be proved, and then fails to tell them that upon this state of facts he is entitled to a verdict of manslaughter; and immediately proceeds to reiterate the difficulties and to tell the jury that unless these are removed, appellant is not entitled to a verdict of manslaughter. If there ever was a case in which appellant's rights on manslaughter should have been safeguarded, it was this case. No doubt that the killing, unrelieved by the circumstances proved by appellant suggesting the defense of manslaughter, showed a homicide of murder in the first degree; but when we look to the facts constituting his defense, we believe that manslaughter was strongly presented. This record is replete with facts showing such a course of conduct on the part of deceased prior to his marriage as was calculated to provoke appellant. When the question was first raised by deceased as to his daughter's chastity, he insisted on having her examined before deceased should marry her. Deceased of his own accord abandoned this and insisted on marrying her without an examination. Subsequently, after deceased and his wife (a girl only 17 years of age), had lived together for quite awhile, they visited Houston, and there deceased again charged her with being unchaste; that she was pregnant from intercourse before his marriage with her; thus renewing his conduct with reference to this

matter. Not only this, after they returned to their home from Houston, he desired to abandon her, suggesting as grounds for divorce that she procure some man to come to her bed and be caught by deceased so he might be afforded a ground for separation. All this outrageous conduct on the part of deceased, appellant knew; and though his passion was aroused, he bore the insults. He left the premises of deceased. Deceased's wife (appellant's daughter), abandoned deceased, he having sued her for divorce. Still, according to this record, appellant does nothing; and is preparing to move from that part of the State. On the eve of his departure, he is informed that deceased has renewed his charge against his daughter; that he proposed, if she appeared in court, to prove she was unchaste, that she was pregnant two months before he married her. It appears from the appellant's own account, and he does not appear to conceal anything, that he became excited, his passion was aroused, and he then determined to kill deceased. He did not undertake to waylay him, but in the open daylight sought him out, and in a public place slew him, and avowed his reason therefor. Reading this record, it does not occur to us that there can be any question that this conduct of deceased towards appellant's daughter, culminating in the message delivered by Vinson to appellant, twenty-five or thirty minutes before the homicide, was the reason and the only reason for appellant's passion; and that on this account he slew him. Doss v. State, 4 Texas Ct. Rep., 567.

While appellant insisted on self-defense we do not believe that the testimony sufficiently raised this question. There was no error in the refusal of the court to give this in charge to the jury.

Believing as we do that the evidence in this record strongly presents a case of manslaughter, and that the court's charge on this subject is erroneous; and for other errors discussed, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Brooks, Judge, absent.