MARVIN GENTRY v. THE STATE.

No. 999.    Decided March 22, 1911.

**1.—Carrying Pistol—Charge of Court—Fearing Attack.**

Where, upon trial for unlawfully carrying a pistol, the defense's testimony tended to raise the issue that the defendant had reasonable grounds for fearing an unlawful attack on his person, and the court submitted the proper charge thereon, there was no error.

**2.—Same—Charge of Court—Peace Officer.**

Where, upon trial for unlawfully carrying a pistol, there was evidence for the defense that the defendant got the pistol for the purpose of taking it to his father who was a constable in the discharge of his duties, and the court properly charged on that issue, there was no error.

**3.—Same—Requested Charges.**

Where the requested charges were substantially embraced in the court's main charge, there was no error in refusing them.

**4.—Same—Evidence—Irrelevant Matter.**

Upon trial for unlawfully carrying a pistol, where defendant sought to show that he acted under instructions of his father, who was a peace officer, in carrying the pistol, there was no error in excluding testimony that a certain party had a mixed reputation and would fight.

**5.—Same—Disqualification of Jurors—English Language—Bill of Exceptions.**

Where, upon appeal from a conviction of unlawfully carrying a pistol, one of the grounds of the motion for a new trial was that one of the jurors who tried him could neither read nor write the English language, but there was no bill of exceptions, or anything in the record showing this matter, the same could not be considered.

**6.—Same—Charge of Court—Defendant's Belief—Innocent Intention.**

Where, upon trial for unlawfully carrying a pistol, the court gave instructions which fairly presented the issue that if the defendant believed he had the right to carry his pistol in aiding his father who was a peace officer, there was no error; especially where no injury resulted, and the defendant had not requested any written charge.

**7.—Same—Sufficiency of the Evidence.**

Where, upon trial for unlawfully carrying a pistol, the evidence fully supported the conviction, and the court submitted a proper charge to the jury, there was no error.

Appeal from the County Court of DeWitt. Tried below before the Hon. Rudolph Kleberg, Jr.

Appeal from a conviction of unlawfully carrying a pistol; penalty, twelve months confinement in the county jail.

The opinion states the case.

No brief on file for appellant.

*C. E. Lane,* Assistant Attorney-General, for the State, cited Shannon v. State, 65 S. W. Rep., 1065.

PRENDERGAST, JUDGE.—The appellant was convicted of unlawfully carrying a pistol in De Witt County on or about August 27, 1910, and his punishment fixed at twelve months confinement in the county jail.

The evidence in this case shows clearly that some time within a year prior to August 27, 1910, the appellant had a difficulty with a negro by the name of Laney Johnson, and that at that time Johnson pulled a gun on him; that on the evening of August 27, 1910, about five o'clock, Laney Johnson and a large number of other negroes—men and women—were in the back room and restaurant part, set apart for negroes, of a saloon in the town of Westoff in De Witt County, and that the negroes were making considerable noise and some disturbance. The appellant at that time entered from the rear of this saloon and went through that part of it where the negroes were located. Passing

through this part of the saloon, he went into the front part. Soon after the appellant entered the front part of the saloon he said to one of the saloon proprietors, "You see that negro; we will have some fun with him in a few minutes." The saloon-keeper remonstrated with him and told him not to start any racket in the saloon. He, the saloon-keeper, then walked behind the bar for a few minutes, and his attention was attracted to the appellant, who was slipping up behind the negro Johnson with an iron pipe which he kept behind the bar to tap beer with. When he got up to the negro he struck him back of his head. This stunned the negro, but, recovering, he turned and faced appellant; drawing his knife from his pocket, he asked who struck him. The defendant then struck at him again, but the lick was warded off by the negro. Another negro then grabbed the iron pipe and jerked it away from appellant. Other negroes then took the negro Johnson out of the saloon through the back part. Just after this the appellant's father, who was constable of that precinct, came into the saloon. He and another then took hold of the appellant, trying to pacify him to prevent any further difficulty. At that time the appellant had in his hand a beer bottle raised. At this time the deputy sheriff, who had been 'phoned for, came into the saloon, and was then told by appellant's father to arrest the said negro Johnson, who was then going away from the saloon and had reached some distance therefrom. Without attempting to then find out what was the matter he started off to arrest the negro Johnson and soon overtook him, and while the negro at first showed some defiance, when he was told by the deputy sheriff of his official position he readily assented to arrest, and the deputy sheriff started off with him to the calaboose to lock him up. In returning with the negro towards the calaboose he passed a short distance from where the appellant was then standing. Another witness was with the appellant at that time, when the appellant said to him, "If they don't lock him up I will kill him," meaning the negro Johnson.

About the time the deputy sheriff reached the saloon, when appellant's father and another were holding him, the appellant's father told the deputy to go and arrest the negro Johnson, as he had left his pistol at home. After the deputy sheriff left them to arrest the negro the appellant asked him where his pistol was, when he stated that it was at home, and the father then told appellant to go and get his pistol for him. The appellant then started off towards his father's house, but instead of going there he only went about half the distance to his father's house and procured from a man at a gin another pistol and put it on and wore it all of the balance of that evening around in the saloon and at other places in the town of Westoff. When he returned with his pistol his father asked him whether he had gotten his pistol, and upon being told that he had not, but had another, he told appellant to keep the pistol and that he, himself, would go home and get his after awhile and come back, and the father did that, being gone from thirty minutes to an hour before he returned,

After the assault and battery by the appellant upon the negro John-son another deputy sheriff, not the one who arrested Johnson, also ap-peared upon the scene and told the negroes if they did not behave them-selves he would lock some of them up in the calaboose. The testimony shows that at once thereafter the negroes became quiet, dispersed, and most of them, if not all of them, left to go some miles in the country to a dance to be held that night. There was no other trouble with the negroes or anybody else after the negro Johnson was arrested, and there was no occasion for the service of any officer thereabout, or in connec-tion therewith, and no need of the summons of any other person, there being then on the ground and for sometime continuously thereafter the said constable himself and two deputy sheriffs. Before the deputy sheriff who had arrested the negro Johnson reached the calaboose, bond was made for the negro and he was discharged, and was not placed in the calaboose.

When the appellant was returning from the gin with the pistol he then had it on his person in the back part of his waistband. He shifted the pistol from the back part to the front part of the waist-band of his pants, and then buttoned up his coat and came up to one of the witnesses, and when asked what he was going to do with the gun, he said, "I am going to shoot the top of that son-of-a-bitch's head off as sure as God made little apples." This witness then went to ap-pellant's father, the constable, and told him that appellant had a gun, and that he had better take it off of him. The father's reply was, "Has he got a gun?" It was then that the deputy sheriff was passing with the negro Johnson, under arrest, near the appellant, when he an-nounced that if they did not lock the son-of-a-bitch up he would kill him. He repeated this several times.

About an hour after the arrest and discharge of the negro and the threat by the appellant above stated, appellant was seen in one of the saloons in Westoff with the pistol on his person. He was standing about the bar and drinking some, and stayed around about the saloon for perhaps as long as two hours after his assault upon the negro. All of this time there was no need of any officer for the purpose of pre-venting any disturbance, because everything was then quiet and there was no disturbance, as the negroes had been warned and dispersed as above stated. One of the deputy sheriffs stated that the father of the appellant asked him to watch the appellant. This was before the father went home and stayed some time, returning with his pistol. The deputy sheriffs, both of them, stated that there was no disturb-ance whatever after the arrest of the negro Johnson and his discharge, and that there was no occasion for the service of any officer; that if there had been they would not have called upon appellant, because he was in no condition to be used as an officer; that he was drinking and carousing around. Something like an hour after the assault by the appellant on the negro, and the negroes had been gone about that length of time, when appellant was standing around in one of the

saloons, he pushed his coat back and put his hand on his pistol, which was in the waistband of his pants, and said to one of the witnesses, "This stands for something."

During the trial of the case, and after this witness had testified to this statement of the appellant, that night while at a picture show with this witness and others, appellant said to the witness that he had told more than he had to tell. Witness replied that he had not, and that he (appellant) knew that he could have told more. Appellant· then told him to keep his head closed.

There was a claim in the case that the constable, appellant's father, had asked, in effect, the appellant to assist him in quieting the negroes and in quelling the disturbance, and that for that purpose he had at the time authorized him to carry the pistol, and that several hours after this trouble he took appellant with him to some negro dance several miles in the country for the purpose of assisting him in his official duties if anything should occur to make it necessary. The testimony, taken as a whole, tends strongly to show that all of this was an afterthought, and was hatched up to try to prevent the conviction of the appellant. The testimony in the case further showed that the negro Johnson was never prosecuted for anything on this occasion; that the appellant was prosecuted and plead guilty to an assault and battery on the negro Johnson; and for abusive language to another negro, which latter had occurred tbout two hours before this trouble in the saloon; that he had before this occasion paid fines in Westoff— one for fighting and another for disturbing the peace. "It is cheaper for me to pay fines in the precinct where I live, for my father is constable and I do not have to pay his fees." He was then under indictment for killing a negro about a year before this. We have thus stated substantially the testimony in the case, which shows, in our opinion, a strong, clear case against the appellant, and attended with circumstances of aggravation. The jury, from all the testimony, were justified in believing that the appellant carried the pistol for two or three hours around in the saloons after all disturbance was over—not as an officer, to perform any duties as assistant to his father, the constable, but that he was carrying it for the purpose of carrying out his threat against the negro Johnson that he would kill him if he was not locked up, if he got the opportunity to do so.

The judge gave a full, fair and correct charge presenting all phases of the case and all phases of defendant's defenses. Among them was his right to carry a pistol on the occasion if he had reasonable grounds for fearing an unlawful attack upon his person. Also if he simply got the pistol for the purpose of taking it to his father, and that he did so with reasonable dispatch, etc.; but if he carried it for his own purpose, or for the purpose of committing an unlawful act, he would be guilty; also that while a constable or deputy sheriff has no power to appoint deputies, yet, where such officer meets with resistance in the arrest of an offender, or in order to disperse a riot, or in order to as-

sist him to prevent an offense against the person or property of another, or to preserve the peace, he may call to his assistance any citizen who may be convenient, and such person so called upon would have authority, while engaged in assisting such officer in carrying out the purposes stated, to carry a pistol; but his authority to do so would terminate as soon as the purposes for which he had been called upon had been accomplished, or when the circumstances which had induced the call had terminated; and under such circumstances if the appellant, with reasonable promptness, divested himself of the pistol after the object or circumstance had been accomplished, to acquit him; but that if, after all of these circumstances and conditions, which made it proper or necessary to carry a pistol had terminated, appellant then continued to carry the pistol an unreasonable length of time, and did not divest himself thereof with reasonable promptitude he would be guilty, even though he did honestly believe he had the right to carry the pistol under the permission or authority of his father. He testified he kept the pistol on his person from the time he got it at the gin, while he was on the street, and in the saloon, which was some two or three hours, while he went that night to the negro dance with his father, and until he returned home about midnight or later.

The appellant complains as to the refusal of several charges requested, which, in effect, asked the giving to the jury of several articles of the Penal Code and Code of Criminal Procedure, such as articles 132, 133, 112, 45, 43 and 44 of the Code of Criminal Procedure, and article 245, Penal Code. All of these charges were refused. While the court did not quote any of these articles in the charge, he did apply such of them as were necessary or proper to be applied to the facts of the case, so that there was no error in the court refusing these special charges. We deem it unnecessary to quote the charge of the court, or these special charges requested. We have carefully considered all of them.

Appellant has a bill of exceptions which shows that while the witness Lord was on the stand defendant proposed to prove by him and he would have testified as follows: "That the negro John Henry Taylor had a mixed reputation, and would fight." The defendant's object and purpose in proposing to introduce this testimony was, as stated in the bill, that the father of the appellant, the constable, acting as a peace officer in said precinct, told appellant to keep the pistol he had sent him for as he might need him, the appellant, to help him keep peace or preserve order. This evidence was excepted to and properly excluded by the Court.

One ground of the motion for new trial is that one of the jurors could not read nor write the English language, and was therefore not a qualified juror. There is no bill of exceptions showing this, nor is there anything in the record or statement of facts anywhere on this subject other than this ground of the motion. Of course, the motion

does not prove itself, is not sworn to, and the court did not err in refusing to grant a new trial on that account.

Two grounds of the motion for new trial, in effect, complain that the court ought to have charged that if the appellant believed he had the right to carry his pistol after his father told him to do so, and if he thought he had the right to carry the same, and had no intention of violating the law, the jury would acquit him.

The court gave in substance charges that fairly presented these questions. Even if there was any technical error therein, which is not pointed out in any way, no injury resulted to him therefrom. Besides this, the appellant did not request any written charge on the subject. Hence, it was not error of the court to fail to charge, even if he had failed, on these subjects.

There is no reversible error and the judgment is affirmed.

*Affirmed.*