### L. E. TRIMBLE V. THE STATE.

No. 18278.   Delivered January 6, 1937.
State's Rehearing Denied April 7, 1937.

The opinion states the case.

*Petsch & Uesner,* of Fredericksburg, *Alfred Mueller,* of Llano, *B. W. Smith,* of San Angelo, *J. H. Baker,* of San Saba, and *Dan Moody,* of Austin, for appellant.

*Carlos Ashley,* District Attorney, of Llano, *Arthur Stehling,* County Attorney, of Fredericksburg, *Herman Toepperwein,* County Attorney, of Menard, *F. H. Hammond,* of Burnet, *Critz & Woodward,* of Coleman, and *Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

LATTIMORE, JUDGE.—Conviction for murder; punishment, five years in the penitentiary.

This killing took place very early in the morning of November 27th. During the night preceding, appellant with one Opp

and several others had been engaged in driving out of what is called the Brown pasture and into that of deceased, some eighteen hundred head of sheep and goats belonging to deceased, which he was pasturing in said pasture theretofore leased by him from Opp. The written lease had expired September 1st, of the same year, but the evidence supports the conclusion that Opp had given to deceased a verbal renewal of same some time in September, which Opp was apparently seeking to override. By registered letter of date September 7, 1934, Opp notified deceased that his lease contract was cancelled and to vacate by November 1st. Deceased seems to have concluded that Opp had no right to peremptorily break the lease contract, and did not vacate.

Appellant was a special ranger located near Gladewater, Texas, and looking for employment. Gladewater is some four hundred miles from Menard, the county seat of Menard County. Opp lived in Menard County and is shown to have gone to Gladewater, to have seen appellant and hired him ostensibly,— and as claimed by appellant on this trial,—to detect and stop sheep stealing. It appears that appellant went at once to his home at Eden, Texas, and on the afternoon of September 26th went to Menard with Opp and others, and that with these and others, all apparently armed, the party proceeded to the pasture above referred to, a distance of some twenty miles from the town of Menard, and said party on horseback and in the night rounded up the sheep and goats mentioned and drove them through a bump gate into the pasture of deceased, upon the discovery of which the next morning deceased and his son, after trying to communicate by telephone with the sheriff of the county, and finding the telephone line not working, went to said bump gate where Opp, appellant and four or five other men were assembled, and at this place shortly thereafter a shooting took place in which appellant was wounded and deceased Tomlinson was killed.

We see no need for setting out at greater length the testimony except same be necessary in order to make clear some conclusion herein set forth. We are of opinion that on the facts shown the jury were justified in their verdict of guilty of the offense charged. Since in our opinion it becomes necessary to reverse this case for errors hereinafter discussed, we pass over alleged errors based on arguments of counsel and statements of State's counsel claimed to be erroneous,—trusting that there will be no need for such complaints upon another trial, if one be had.

We see no vice in allowing proof of what deceased told his son to do at or about the time they drove up to said bump gate and stopped their car. Appellant made no claim of any kind based on the proposition that he heard any part of said statement, or that what was said to or done by the son, after said statement, in any way affected or influenced him, appellant, or that whatever statement may have been made by deceased to his son could or did affect the jury in their consideration of appellant's right to act, from the standpoint of the transaction as viewed by him, upon reasonable appearances of danger at the time, in the light of what appellant knew, saw or heard.

We find nothing in the record supporting any claim of a lawful or peaceable re-entry by Opp or this appellant, as an employee of Opp, upon the land theretofore leased by Opp to the deceased. There is no dispute in testimony of the fact that Opp had renewed his lease of said pasture to deceased, and that deceased was lawfully in possession of same on the night of this killing; nor do we find anything showing that Opp's invasion of said pasture with an armed force on said night, and his surreptitious driving of the sheep and goats of deceased from said pasture, was either right or justifiable in law.

Appellant made no claim while a witness that he was employed by Opp for any other purpose than to do special ranger service in sheep theft cases, which job he said Opp told him would last that fall and through the following winter. He swore that Opp agreed to pay him for this service $150.00 per month for five or six months. Cross-examined while a witness, appellant swore that Opp must have driven around four hundred miles in order to employ him to work on sheep theft cases; and that he knew of no other reason why Opp should have driven this far to have employed him. Appellant said "Except he wanted some one to work on sheep theft cases." He further testified: "I was expecting to receive one hundred and fifty dollars a month for working on these sheep theft cases. * * * When I got in the car that night I thought I was going to Menard County to work on sheep theft cases. * * * I did not tell Mr. Opp that I was employed to work on sheep theft cases, and that I was not employed to help him round up sheep." Appellant also testified on direct examination that when deceased drove up to the bump gate mentioned, and demanded to know what they were doing there, he, appellant, told deceased he was an officer of the law and had a right to be there.

Complaint is made of the reception of testimony that at some time on the night of the 26th of September, after 7 o'clock

P. M., and before 8 o'clock A. M. of the 27th, the telephone wire leading to the home of deceased was cut. We think the complaint without merit. It was shown that some ten miles out from the town of Menard a lane called Russell lane branched off from the Menard-McKavett road, and that up this lane a telephone line went which served only four houses, that of deceased being one of them. This line was used by a customer about 7 P. M. on the 26th and at such time connection was made with Menard. On the morning of the 27th deceased and his son tried to phone the sheriff at Menard but got no response. Another attempted use of the line by another party met the same result. Later it was discovered by representatives of the telephone company that at a point some sixty feet from where Russell lane left the McKavett road, the telephone wire was cut. It was freshly done, and car tracks were observed turning out from the road, and also human tracks were noted at the place where the cut was. It was in testimony that during the existence of said private line it had never been cut or broken before. A pair of wire cutters or pliers were found lying in one of the cars driven by appellant's party on the night of the 26th up Russell lane. The State's theory evidently was that appellant and those engaged with him in the enterprise of throwing goats and sheep out of the Brown pasture and into the pasture of deceased, cut the wire to prevent communication with officers and to enable them to accomplish their object in removing said livestock without interference. We regard the evidence as admissible, but note that the charge of the court was excepted to for its failure to instruct the jury that such evidence should not be considered by the jury for any purpose in this case, unless they found from the testimony that such cutting was done by appellant or those acting with him in the removal of said stock. We are of opinion such charge should have been given.

We find nothing in the record supporting any claim of right on appellant's part to act in defense of property, or in repelling any invasion of property by Tomlinson, or that appellant had any legal right to bear arms at such time and place, or that there had been any peaceable re-entry of leased premises after the expiration of a lease. As stated above, the evidence that Opp had renewed Tomlinson's lease on the Brown pasture was without contradiction. Opp's own letter written in September was an admission of the existence of such lease. That one who knows he had made a lease may, during its existence, write his lessee and notify him that his lease is terminated, and then

vi et armis enter surreptitiously in the nighttime said leased premises and drive from same the property thereon found belonging to the lessee,—may not be heard to say he has made a peaceable re-entry,—would hardly seem debatable; nor does it appear to us that one employed by such lessor, as above set out, for the purposes related, who is so engaged as this appellant was,—could have any greater rights in the premises than could his employer, the lessor. We are of opinion that the trial court did not err in submitting to the jury only appellant's right of self-defense as against an unlawful attack, if any made, by Tomlinson.

We do not discuss at any length the proposition advanced by appellant that the court should have charged the jury that he had a right to go and be armed at the time and place of this killing. At most appellant was a special ranger, and as such would have only the right pertaining to any other peace officer similarly situated. As said by this court many times, when the condition that sanctions the carrying of a deadly weapon ceases, the right ceases. No peace officer may arm himself and thereafter aid in the violation of public laws or private rights, and vantage himself by seeking to invoke a right to carry arms pertinent only when such officer is about his duty and within the law. O'Neal v. State, 32 Texas Crim. Rep., 42; Lovelace v. State, 68 S. W. Rep., 274; Woodroe v. State, 50 Texas Crim. Rep., 212; Baker v. State, 53 Texas Crim. Rep., 29; Gentry v. State, 61 Texas Crim. Rep., 619. Art. 484, P. C., sets forth the exemptions allowable under the law forbidding the carriage of pistols, etc., and specifically exempts a peace officer "When in the actual discharge of his official duty." This is discussed in Jones v. State, 91 Texas Crim. Rep., 240. Appellant clearly was not in the actual discharge of any duty imposed by law upon a peace officer when and as he shot Tomlinson, and nothing in the provisions of the Revised Civil Statutes of Texas, Arts. 6560-6573, is to the contrary.

It is complained in bill of exceptions 29 that after the shooting, in which deceased was killed, appellant, who was wounded, was taken by the sheriff to the office of a doctor at Menard, more than twenty miles from the scene of the fatal difficulty. Appellant was taken to said doctor's office under arrest. The sheriff left him there in the custody of the city marshal and two others with instructions to take him to the county jail as soon as he was treated by the doctor. Appellant was shown to be suffering from pain and nervous shock. He had been shot in the lower part of the body by a shot gun. It was shown

that his heart and respiration were abnormal, and the first treatment by the doctor was to give him morphine and aromatic spirits of ammonia, the effect of which is not made to appear.

One of the men left to guard appellant was used as a witness by the State, and testified, over objection by the defense, that while appellant was on the operating table in the doctor's office, and while the doctor was treating his gun shot wound, witness heard H. B. Opp talk twice over a telephone in said office, and that in the first conversation Opp said: "Hello, is that you Mr. Davenport? This is H. B. Opp at Menard: I want you to come down here; we have had trouble; I want you to call the Governor and have a detachment of rangers sent here, and you get down here as quick as you can; that the man I was talking to you about,—the trouble I was talking to you about, has happened, and Mr. Tomlinson is killed and Mr. Trimble is wounded, and is here in the doctor's office now." Witness testified to a second telephone conversation by Mr. Opp, in which he said: "Hello, hello, is this you Mr. Henderson; this is H. B. Opp at Menard. I want you to come here as quick as you can, and call Mr. Flowers and have him come down; that what I was talking to you about has happened."

As we understand it, the State's main insistence was and is that these were res gestae statements, and made by one who was a principal with appellant in whatever offense was committed; and who was a coconspirator with appellant in a conspiracy which had not ended or accomplished its purpose at the time these telephone conversations were had.

What makes a conversation, had subsequent to an alleged crime, res gestae? Clearly,—the occurrence claimed a crime, must speak through the one conversing, instinctively, spontaneously. Not so here. Opp referred to a conversation had at some unknown former time, and said to his listener "That what I was talking to you about,—has happened." There was no outburst as to the attack or defense or weapon or detail of the tragedy. Nothing in either conversation reflects spontaneity or an occurrence speaking through the person talking. The killing occurred on a ranch twenty miles from the locus of the telephone conversation. How long after the killing the conversation took place is expressed by no witness. It would appear reasonable that Opp, who was present at and a claimed participant in the shooting, should have been excited by the occurrence and its surroundings, but no effort was made to show that when he talked over the telephone he was either excited or agitated. Nor is there any account of what occurred

between the shooting and the telephone conversation to support or indicate the theory that whatever excitement or agitation was caused by the shooting, continued without let until the time of the talking.

Nor are we able to agree to the proposition that the conversation was admissible on the theory that appellant and Opp were co-conspirators, and that the conspiracy was not ended. If it be the State's position that there was a conspiracy to kill Tomlinson, certainly that was ended. All that appellant or Opp had done or could do to effect that object, was over with. If the claim be that there was a conspiracy to get the sheep and goats out of Opp's pasture,—that also seems to have ended. We find no testimony plausibly suggesting any conspiracy between appellant and Opp aside from the two theories mentioned.

There appears no ground for any claim that the conversacution of Opp over the telephone was admissible upon the proposition that appellant heard and assented to criminating statements made in his hearing. Appellant when a witness denied having heard any telephone conversation, and neither of the other men nor the doctor were used as witnesses to establish otherwise. None of them said appellant heard or that he was in position or condition to hear said telephone conversation. The doctor was used as a witness, and two of the men who were present, but their testimony is wholly devoid of any proof going to establish the fact that appellant heard or understood what Opp was saying over the telephone. We do not think it necessary to go into the further proposition, which is well settled, that appellant was under arrest at the time, and in such condition was not called upon, even if he heard it, to remonstrate or explain.

That the things said over the telephone were capable of injury to the cause of appellant is too plain for discussion. Same conveyed to the jury that Opp, at a time anterior to his employment of appellant, and before their going out to the Brown ranch, and before the removal of Tomlinson's sheep and goats from said pasture, and before Tomlinson was shot,—had talked with both Mr. Davenport and Mr. Henderson about his pending trouble with some one, probably Tomlinson, and that what he told them might happen to him, or to Tomlinson or to Trimble, or to any other employee of Opp's engaged in such enterprise, had happened. In other words, said conversation made the jury directly aware of the fact that the plan of events whose march resulted in the killing of Tomlinson and getting appellant shot, had been mapped out and discussed beforehand

at least between Henderson and Davenport and Opp before the night of the foray and killing, and it would not have been an illogical inference that in said prior discussion appellant's probable or possible part in the apprehended trouble was talked of. On the admissibility of this testimony see Fuller v. State, 50 Texas Crim. Rep., 14; Holman v. State, 92 Texas Crim. Rep., 364. As to it being objectionable upon the ground of conspiracy see Sarli v. State, 80 Texas Crim. Rep., 161; Jackson v. State, 123 Texas Crim. Rep., 345; Bloxom v. State, 86 Texas Crim. Rep., 562; Baird v. State, 111 Texas Crim. Rep. 640.

Being of opinion that in the matter just above discussed as well as that of the refusal of the court to properly instruct the jury regarding the cutting of the telephone line, there was error for which reversal must be had, the judgment of the trial court will be reversed and the cause remanded.

*Reversed and remanded.*

MORROW, P. J., absent.

### ON MOTION FOR REHEARING.

HAWKINS, JUDGE.—The State bases a motion for rehearing upon two propositions; the first being that we were in error in holding that the trial court should have instructed the jury that the circumstance of the telephone wire being cut should not be considered for any purpose unless they found from the testimony beyond a reasonable doubt that appellant or those acting with him had cut the wire. This same question has been again considered in the opinion on rehearing this date in the companion case of Opp v. State, No. 18,491 (Reported on page 221 of this volume), and a further discussion here is not deemed necessary.

The State's second proposition is that the statement made by Opp over the telephone to Henderson and Davenport subsequent to the killing should have been held admissible against appellant and that this court fell into error in concluding to the contrary. This question was considered and discussed at length in our original opinion and we remain of the same mind about it.

The motion for rehearing is overruled.

*Overruled.*