

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## NOS. PD-0093-25 & PD-0094-25

### THE STATE OF TEXAS

### v.

### CHRISTOPHER TYE COLEMAN, Appellee

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW FROM THE TWELFTH COURT OF APPEALS MADISON COUNTY

**PARKER, J., delivered the opinion of the Court in which SCHENCK, P.J., and YEARY, KEEL, and FINLEY JJ., joined. SCHENCK, P.J., filed a concurring opinion. MCCLURE, J., concurred. NEWELL, J., filed a dissenting opinion in which RICHARDSON and WALKER, JJ., joined.**

OPINION

A "cattle ranger" has limited law-enforcement powers. Here, the cattle

ranger questioned a suspect about an offense that we will assume falls outside those

limited powers. Without informing the suspect of the limitations on his authority,

the cattle ranger identified himself as such, said he was still a police officer, and asked questions during a consensual encounter. Under those circumstances, did the cattle ranger commit the offense of impersonation of a public servant? We answer that question "no" and reverse the judgment of the court of appeals.

## I. BACKGROUND

### A. The Interview

Steven Jeter, a retired Texas Ranger, had been hired by the Texas & Southwest Cattle Raisers Association (TSCRA) to be a Cattle Ranger. In June 2022, an attorney contacted Jeter on behalf of a father whose son, a minor, "was having some issues with [Appellee] and ultimately made an outcry that he was having -- sending pictures and was having sex with other males." Appellee and the son had met on Grindr and exchanged photographs of each other's penises on Snapchat. Jeter took an outcry statement from the son and then contacted the Sheriff's Office and the District Attorney's Office. He told them of the outcry but was not deputized by either office to conduct an investigation.

Dressed in blue jeans, boots, and a dress shirt and wearing a badge and a gun, Jeter went to Appellee's residence, turned on an audio recording device, and knocked on the door. The badge Jeter wore was from the Cattle-Rangers

Association.  It was similar to a Texas Rangers' badge (circular with a star in the middle) but also had a steer on it.  When Appellee answered, Jeter introduced himself as "Steve Jeter" and asked if he could come in.  After being let inside, Jeter told Appellee that he had been "working this County for a long time,"  had been with the Texas Rangers, had worked for the Sheriff's Department, and now worked for the Cattle Rangers.   He then asked, "Do you have any idea what I want to visit with you about today?"  Appellee responded, "Probably so."

Jeter questioned Appellee for about 45 minutes, during which time Appellee admitted to the exchange with the child of photos of each other's sexual organs.  Appellee said that he sent the child 15 to 20 photos and that 4 or 5 of them showed his penis or buttocks exposed.  Appellee said that he was not initially aware of the child's age, since Grindr required users to be at least 18, and that he stopped communications with the child when he became aware that he was 16.  During the conversation, Jeter told Appellee that, when they were done, he was going to talk to the District Attorney.  Appellee referred to a message sent to him on his phone and said, "I'll show it to you."  Jeter then asked, "What's your passcode?" and Appellee gave it to him.

About a minute later, Appellee said that he knew Jeter was going to come

talk to him because the boy's father had said he was going to call the Texas Rangers. Jeter corrected Appellee, saying, "I'm not with the Texas Rangers anymore. I retired from the Texas Rangers, but I work for the Cattle Rangers. I'm still a police officer. Okay. Just so you don't get confused." Appellee acknowledged this and continued talking.

Later in the interview, Jeter said he was going to take Appellee's phone with him. He did not tell Appellee that he could refuse, and though he had used consent forms in the past, he did not seek to have Appellee sign such a form.

## B. Motion to Suppress

Appellee filed a motion to suppress. He alleged that the State had "not located a single pornographic image or any lewd material despite having searched the Defendant's telephone, the juvenile's telephone, and their respective Snap Chat accounts." He contended that the State's case rested solely on the oral statements made by Appellee and the juvenile. He further contended that both Appellee's statements and the juvenile's statements to Jeter must be suppressed. He also claimed that any telephone evidence must also be suppressed.

As reasons for suppression, Appellee claimed that Jeter committed a number of crimes in obtaining the statements. One of the crimes Appellee alleged Jeter to

have committed was impersonation of a public servant.

## C. Suppression Hearing and Findings

At the suppression hearing, the trial court asked, "[W]hat are we trying to suppress here?" Defense counsel responded, "Primarily the statement that was taken by Mr. Jeter from the Defendant." The defense called Jeter to testify as an adverse witness. Jeter testified about how he was dressed that day and described some of what occurred during the interview. He stated that he never drew his gun and that Appellant was not in custody during the interview. He expressed the opinion that he had authority to enforce the law to protect "life and property" and that, "without a doubt," there was the potential for the father's family's life or property to be in harm's way. Jeter explained that he had contacted a DPS trooper who had been in contact with the Texas Ranger assigned to the area, and that the trooper had said the Ranger would be "out of pocket for another week."

After Jeter finished testifying, the State offered the recording of the interview with Appellee, and the trial court admitted it. Then the State sought to play the recording, but the defense said the recording was not relevant to Jeter's authority. The State replied that the recording was relevant because "you can hear the interactions that he has initially with the Defendant."

The trial court responded, "I have no doubt it was a casual conversation. I take Jeter at his word." But, the trial court said, "the State may be a victim of their own division of labor," with Jeter's authority being restricted to "cattle theft or agricultural issues." The trial court further said that Jeter "didn't beat the confession out of" Appellee and that it was "a noncustodial statement." Thus, the trial court was not worried about *Miranda* warnings[1] and considered the statement to be voluntary. But, the trial court said, Appellee "didn't know whether [Jeter] was a Texas Ranger, law enforcement officer, or what he was." Because the trial court did not perceive the content of the recording to be relevant to Jeter's authority, it declined to listen to it.

The parties clashed over two statutes that arguably governed Jeter's authority. The State relied upon Government Code section 411.023 for the proposition that a cattle ranger, as a species of "special ranger," had general authority to "protect life and property."[2] Appellee relied upon Code of Criminal Procedure article 2.125 for the proposition that a cattle ranger's authority is limited

---

[1] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

[2] *See* TEX. GOV'T CODE § 411.023(b).

to "an offense involving livestock or related property."[3]  The prosecutor also contended that the type of evidence at issue—digital photos—could be easily destroyed during the week one might wait for the assigned Texas Ranger to return.

One of the defense attorneys asked if the lack of authority to obtain Appellee's statement would apply also to the phone.[4]  The trial court seemed less sure about whether the phone was excludable but thought that it was if Jeter "didn't have any authority to be there in the first place."  Because the judge thought that lack of authority would be a reason to exclude Appellee's recorded statement, he instructed the parties to target their briefs to the statement.

One of the prosecutors pointed out that the defendant could make a statement to anyone and it would be a statement against interest.  The trial court responded that he thought it made a difference that "he did it under interrogation."  The prosecutor responded that, given the type of case it was, they did not have time to wait a week.  The trial court accepted that contention but said

---

[3]  *See* TEX. CODE CRIM. PROC. art. 2.125(b) (West 2022); *see also id.* art. 2A.006(c) (West 2024) (effective January 1, 2025).  All further references to articles within Chapter 2 are to the West 2022 version of the Code of Criminal Procedure, and all further references to articles within Chapter 2A are to the current version of that code.

[4]  But the defense had pointed out earlier in the hearing, when arguing a notice allegation, that a State expert had conducted a forensic analysis of the telephone and found nothing.  One of the prosecutors retorted that "the reason we don't have photos is because the defendant deleted it."

that Jeter was "not the only cop in Madison County, Texas." The trial court took the motion to suppress under advisement and gave the parties 45 days to brief the issue.

The parties briefed the issue, and the State submitted two manuals produced by TSCRA: a "Special Ranger Training Manual" and an "Employee Handbook." The training manual referred to Section 411.023 as conferring authority on a Special Ranger to enforce laws designed to "protect life and property."[5] The employee handbook referred to "statutory limitations" that included not having the authority to enforce laws "except those designed to protect life and property."[6] The defense contended that a special ranger was not a peace officer and reiterated that Jeter had committed various crimes in suggesting that he was a peace officer or a Texas Ranger. Notably, the defense did not contend that Jeter violated any of Appellee's constitutional rights.[7]

---

[5] Texas & Southwestern Cattle Raisers Association, SPECIAL RANGER TRAINING MANUAL, § 3.3.

[6] Texas & Southwestern Cattle Raisers Association, EMPLOYEE HANDBOOK, § 5.2.

[7] The defense's only reference to constitutional provisions appears to be in an argument that the trial court need not consider them:

> The Court may be tempted by the State of Texas to resolve this question by considering whether the Defendant's statement was voluntarily given for purposes of the 5th and the 14th Amendments to the U.S. Constitution, but the Court should not even get to that question in this case. Voluntary or not, the

Later, the trial court issued written findings. In relevant part, the findings

provide:

> 2. The issue identified by the Court was whether or not a Special
> Ranger for the Texas and Southwestern Cattle Raisers Association
> (TSCRA) had the authority and jurisdiction to investigate a child
> pornography allegation and collect evidence which included a taped
> statement from Defendant.
>
> * * *
>
> 5. The court finds that the statement was voluntarily made without
> coercion or promise of benefit.
>
> * * *
>
> 9. Page 10 [of the employee handbook] allows them to assist other Law
> Enforcement Agencies but gives no further guidance as to what
> assistance may mean.
>
> * * *
>
> 11. In the Employee Handbook page 29 paragraph 5.2 Special Ranger
> shall not have authority to enforce any laws except those to protect life
> and property.
>
> 12. § 411.023 TX Government Code confers authority over Special
> Rangers to "protect life" but gives no guidance as to what that
> authority confers.
>
> 13. Article 2.125 C.C.P. limits Special Ranger's authority to make
> arrests except "when necessary to prevent or abate the commission of
> an offense involving livestock or related property."

---

Defendant's statement would not have been given at all had the Special Ranger
not first lied about his authority to obtain the statement. Thus, before getting to
any voluntariness analysis, the Court must first determine whether the Special
Ranger lied to get the statement and the Defendant's cellular telephone and
whether that lie violated Texas penal law. The Defendant submits that the
Special Ranger's deception was barred by penal statute and therefore all evidence
obtained by his unlawful deception must be suppressed.

14. Based on the court's review of the above[,] there is no dispute that this was not a livestock or property complaint.

15. The testimony revealed Special Ranger Jeter was contacted by the complainant's father and the father's attorney, therefore there seems no dispute that he was not assisting any other law enforcement entity.

\* \* \*

17. It is obvious that the defendant believed Special Ranger Jeter had authority in that the Special Ranger appeared at defendant's home in uniform and defendant elected to cooperate.

18. The court does not concede the defendant's belief ends the inquiry.

19. Neither statute refers to Special Rangers as certified peace officers except in livestock and property related crimes and that they must meet the standards of the Texas Commission on Law Enforcement (TCOLE).

20. Further[,] they have no authority to arrest for any offense other than livestock or property crimes, they receive no state benefits provided to peace officers and the state is not liable for any of their acts or omissions.

\* \* \*

22. The state at the hearing argued that necessity and exigency of the state investigating child porn allegations existed, due to the possibility of the spoliation of evidence.

23. The court agrees with this observation in general[;] however, this court believes that Madison County law enforcement has adequate resources to accomplish this task.

\* \* \*

25. In this limited case[,] the statutes fail to give the Court any guidance as to what the legislative intent was in the general terminology "protect life."

26. These words are followed by the words "to protect life and property." It seems a stretch by the court to be able to lump any offense where there may be a potential victim in this language. Does the phrase mean human life or animal life or both?

27. The defense reply brief spends a lot of time casting dispersions and making allegations that were not part of the evidence at the hearing and the court declines to consider those issues.

28. While the defense claims that the handbooks and employee manuals are not authority[,] the court would point out that Art. 2.125(h) specifically allows the director of TSCRA to promulgate rules under which officers are expected to comply.

29. The Court is of this opinion of this court that based on Art. 2.125 CCP, § 411.023, and the Policy Manuals of TSCRA [sic] restrict officers to the investigation of property and livestock issues.[8]

With these findings, the trial court granted the motion to suppress.

## D. Appeal

The State appealed. In its first issue, the State argued that Appellee lacked standing to challenge Jeter's authority to investigate because Appellee failed to show that Jeter violated his rights.[9] The court of appeals concluded that Appellee

---

[8] Bracketed material added. For ease of reading, some spelling and punctuation errors have been corrected without attribution. In finding 7, the trial court found that TSCRA regulations require a cattle ranger to identify himself as such. In finding 8, the trial court deemed it unclear whether Jeter complied with that regulation before interrogating Appellee, but the recording (that the trial court did not listen to) definitively shows that he did.

[9] *See State v. Coleman*, Nos. 12-24-00104-CR, 12-24-00105-CR, — S.W.3d —, 2024 WL 4643429, *3 (Tex. App.—Tyler October 31, 2024).

had standing because Jeter committed the offense of impersonation of a public servant.[10] The court concluded that the trial court could have "reasonably impliedly determine[d] that Jeter impersonated a public servant with the intent to induce Appellee to submit to his pretended official authority."[11] And the appellate court concluded that the impersonation statute is intended to protect the public (including Appellee) "from the risk of submitting to the pretended authority of an individual impersonating an agent of a governmental unit."[12]

In its third issue, the State argued that Jeter acted within his authority because § 411.023 conferred general authority to enforce laws designed to protect life and property.[13] The court of appeals concluded § 411.023 applied only if the special ranger is called "for special duty" by the Governor or the Public Safety Commission and that Jeter was not so called.[14] Absent such a calling, the court held, a cattle ranger possessed only the authority conferred by Article 2.125—to prevent or abate the commission of an offense involving livestock or related

---

[10] *Id.* at *4-5.

[11] *Id.* at *5.

[12] *Id.*

[13] *See id.*

[14] *Id.* at *6-8.

property.[15] After disposing of the State's third issue, the court of appeals affirmed the trial court's suppression order.[16]

## II. ANALYSIS

## A. Standard of Review

Constitutional and statutory confession claims are evaluated under the bifurcated *Guzman* standard.[17] Under that standard, an appellate court (1) accords deference to the trial court's resolution of questions of historical fact and application-of-law-to-fact questions that turn on credibility and demeanor and (2) reviews *de novo* any application-of-law-to-fact questions that do not turn on credibility and demeanor.[18] While we sometimes say that an appellate court defers to the trial court's "ruling," we really mean that it defers to the trial court's "findings," if there are any,[19] which can yield more complicated results when the

---

[15] *Id.* at *7.

[16] *Id.* at *8.

[17] *Sandoval v. State*, 665 S.W.3d 496, 515 (Tex. Crim. App. 2022) (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)).

[18] *Id.*

[19] *See State v. Lujan*, 634 S.W.3d 862, 865 (Tex. Crim. App. 2021) (saying that the evidence must be viewed in the light most favorable to the trial court's "ruling" but explaining that an appellate court "should confine its factual review to determining whether the trial court's *findings* were reasonable in light of the evidence presented.") (emphasis added, internal quotation marks and citations omitted); *Sandoval*, *supra* at 515, 519-20 (talking about deference to the trial court's "ruling" but later observing that we requested statutorily-required findings

trial court makes at least some findings that favor the losing party. The deference

we afford the trial court on historical facts encompasses electronic recordings, but

there are times when electronic recordings establish facts conclusively, even under

the deferential lens.[20]

Under what we have called the "*Calloway* rule," a trial court's ruling must

be upheld if the ruling "is correct on any theory of law applicable to the case even if

the trial court did not purport to rely on that theory and the prevailing party did not

explicitly raise the theory."[21] The *Calloway* rule can apply even in a State's

appeal,[22] though the rule does have limits,[23] which, for reasons discussed later, we

---

when they were absent); *Tucker v. State*, 369 S.W.3d 179, 184 (Tex. Crim. App. 2012) ("When the trial court *does not make findings of fact*, appellate courts view the evidence in the light most favorable to the trial court's ruling and assume that the trial court made implicit findings that buttress its conclusion.") (emphasis added, internal quotation marks omitted).

[20] *Monjaras v. State*, 664 S.W.3d 921, 926 (Tex. Crim. App. 2022) ("However, if evidence is conclusive, such as indisputable video evidence, we may disregard any trial court findings inconsistent with the conclusive evidence."); *Miller v. State*, 393 S.W.3d 255, 263 (Tex. Crim. App. 2012) ("But when evidence is conclusive, such as a written and signed agreed stipulation of evidence or 'indisputable visual evidence,' then any trial-court findings inconsistent with that conclusive evidence may be disregarded as unsupported by the record, even when that record is viewed in a light most favorable to the trial court's ruling."); *Carmouche v. State*, 10 S.W.3d 323, 332 (Tex. Crim. App. 2000) ("[W]e cannot blind ourselves to the videotape evidence simply because Williams' testimony may, by itself, be read to support the Court of Appeals' holding.").

[21] *State v. Castanedanieto*, 607 S.W.3d 315, 327 (Tex. Crim. App. 2020).

[22] *State v. Copeland*, 501 S.W.3d 610, 613-14 (Tex. Crim. App. 2016).

[23] *In re Green*, 713 S.W.3d 843, 858 (Tex. Crim. App. 2025); *Castanedanieto*, 607 S.W.3d at 327.

need not explore here.

## B. The "Cattle Ranger" Statute

It is undisputed that Jeter was a "cattle ranger" appointed under Article 2.125 (now Article 2A.006).[24]  Ultimately, the court of appeals's holding turns on the limited authority possessed by a person holding that position.  To set the stage for our discussion, then, we look at what the authorizing statue says about this type of position. Article 2.125 authorizes the director of the Department of Public Safety (DPS) to appoint "special rangers who are employed by the Texas and Southwestern Cattle Raisers Association to aid law enforcement agencies in the investigation of the theft of livestock or related property."[25]  Regarding the authority of these special rangers, subsection (b) of the statute provides:

> Except as provided by Subsection (c) of this article, a special ranger may make arrests and exercise all authority given peace officers under this code when necessary to prevent or abate the commission of an offense *involving livestock or related property*.[26]

Subsection (c) forbids this type of special ranger from issuing traffic citations.[27]

---

[24]  *See* TEX. CODE CRIM. PROC. art. 2.125; *id.* art. 2A.006.

[25]  *Id.* art. 2.125(a).

[26]  *Id.* art. 2.125(b) (emphasis added).

[27]  *Id.* art. 2.125(c).

Subsections (d) and (g) say that this type of special ranger is not entitled to State benefits and that the State is not liable for his conduct.[28] Subsection (e) provides that, for someone to be this type of special ranger, TSCRA must submit an application for appointment to the director of the DPS, the director must issue the person "a certificate of authority to act as a special ranger," the executive director of TCOLE must determine that the person meets certain minimum standards to be a special ranger, and the person must meet "all standards for certification as a peace officer" by TCOLE.[29] Subsection (f) provides that the director of DPS may revoke the special ranger license for good cause, and subsection (h) gives the director of DPS the authority to "promulgate rules necessary for the effective administration and performance of the duties and responsibilities delegated to them by this article."[30]

On appeal, the State contended that cattle rangers were also governed by § 411.023. That statute authorizes the Public Safety Commission to appoint "special rangers"[31] and provides that such special rangers are:

---

[28] *Id.* art. 2.125(d), (g).

[29] *Id.* art. 2.125(e)(1)-(4).

[30] *Id.* art. 2.125(f), (h).

[31] TEX. GOV'T CODE § 411.023(a).

subject to the orders of the commission and the governor *for special duty* to the same extent as other law enforcement officers provided for by this chapter, except that a special ranger may not enforce a law except one designed *to protect life and property* and may not enforce a law regulating the use of a state highway by a motor vehicle."[32]

The State relied on the "life and property" portion of the statute to argue that Jeter's authority extended beyond livestock and related property. And as explained earlier, the court of appeals relied on the "for special duty" portion of the statute to conclude that Jeter had no general mandate to protect life and property because he was not called for special duty. We need not resolve this question and will assume *arguendo* that the court of appeals is correct that § 411.023 does not apply.

## C. Article 38.23 - The Texas Exclusionary Rule

Article 38.23 provides in relevant part:

No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.[33]

The plain language of this statute applies even when a private individual commits

---

[32] *Id.* § 411.023(b) (emphasis added).

[33] TEX. CODE CRIM. PROC. art. 38.23(a).

the violation and even when the violation is statutory rather than constitutional.[34]

We observe here that no one has suggested that Appellee's constitutional rights were violated by Cattle Ranger Jeter. The various grounds for suppression urged by Appellee, the trial court, and the court of appeals are all based on statutes.

Although Article 38.23 allows the violation of a statute to be a basis for suppression, under current precedent construing that statute, a defendant seeking to use Article 38.23 must still show "standing": that he has "suffered an infringement of a legal right."[35] And under current precedent, such an infringement is not shown by the mere fact that a law-enforcement officer lacked statutory authority to conduct an investigation.[36] However, if an officer or a private individual commits a crime of deception against the defendant that persuades him to confess, the defendant might have standing to assert that law violation.[37]

---

[34] *State v. Ruiz*, 577 S.W.3d 543, 547 (Tex. Crim. App. 2019) (Art. 38.23's "'other person' provision has supported suppression of evidence obtained by private individuals in violation of criminal laws.").

[35] *Bluntson v. State*, No. AP-77,067, --- S.W.3d ---, 2025 WL 1322702, *36 (Tex. Crim. App. May 17, 2025) (citing *Chavez v. State*, 9 S.W.3d 817, 819, 822 (Tex. Crim. App. 2000)).

[36] *Chavez*, 9 S.W.3d at 818-20 (Art. 38.23 did not require "the exclusion of evidence that a Rural Area Narcotics Task Force (RANTF) undercover police officer obtains outside the geographical boundaries set out in an Interlocal Assistance Agreement . . . authorized by Section 362.002(b) of the Local Government Code.").

[37] *Wilson v. State*, 311 S.W.3d 452, 454 (Tex. Crim. App. 2010) (Art. 38.23 required exclusion of confession when interrogating officer fabricated documentary evidence in violation

In *Wilson*, this Court found that violating the statute against fabricating evidence can confer standing.[38] There, the Court suggested that a statutory violation confers standing only if the statute that was violated has a purpose that is related to "the acquisition of evidence for prosecution" or related in some other way to the purpose of the exclusionary rule.[39] The Court said that the fabricating-evidence statute qualified because it had a purpose "to maintain the honesty, integrity, and reliability of the justice system and prohibiting *anyone*—including members of the government—from creating, destroying, forging, altering, or otherwise tampering with evidence that may be used in an official investigation or judicial proceeding."[40]

The trial court based its suppression ruling solely on a conclusion that Jeter lacked authority to conduct the investigation. That lack-of-authority conclusion was not enough under current precedent to confer standing under Article 38.23. Seeing this standing problem, the court of appeals upheld suppression on the basis that Jeter committed the crime of impersonation of a public servant. We will

---

of TEX. PENAL CODE § 37.09 and used that evidence "to persuade a suspect to confess.").

[38] *Id.*

[39] *Id.* at 459.

[40] *Id.* at 460.

assume *arguendo* that this postulated crime sufficiently implicates the purposes of Article 38.23 under our precedent to confer standing. We will also assume *arguendo* that, if this impersonation theory were to have merit, the court of appeals could legitimately rely upon it as a "theory of law applicable to the case" under the *Calloway* rule.

### D. § 37.11 - The Impersonation Offense

A person commits impersonation of a public servant if the person:

(1) impersonates a public servant with intent to induce another to submit to the person's pretended official authority or to rely on the person's pretended official acts; or

(2) knowingly purports to exercise, without legal authority, any function of a public servant or of a public office, including that of a judge and court.[41]

The court of appeals seems to have relied on subdivision (1). To violate that subdivision, the officer must, among other things "impersonate" a public servant. To the extent a cattle ranger is a public servant, Jeter was in fact a public servant. But, we take the court of appeals to mean that Jeter impersonated a *different* public servant. To resolve whether that conclusion is correct, we must explore the meaning of the word "impersonate."

---

[41] TEX. PENAL CODE § 37.11(a).

A court must interpret a statute in accordance with the plain meaning of its text, unless the text is ambiguous or the plain meaning leads to absurd results that the Legislature could not have possibly intended.[42] As part of the plain-meaning analysis, a court may look to standard dictionaries.[43] The current edition of Black's Law Dictionary includes a subheading under "impersonation" called "false impersonation," which then provides the following definition:

> The crime of falsely representing oneself as another person, often a law-enforcement officer, for the purpose of deceiving someone.[44]

And older edition of Black's Law Dictionary defines "impersonation" in the following way:

> False impersonation is representing oneself to be a public officer or employee or a person licensed to practice or engage in any profession or vocation for which a license is required by state law with knowledge that such representation is false. The act of pretending or representing oneself to be another, commonly a crime if the other is a public official or police officer.[45]

From these definitions, tailored specifically for impersonation offenses, we derive

---

[42] *Cont'l Heritage Ins. Co. v. State*, 683 S.W.3d 407, 411 (Tex. Crim. App. 2024); *Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991).

[43] *Milton v. State,* 721 S.W.3d 300, 303 (Tex. Crim. App. 2025); *Ex parte Reeder*, 691 S.W.3d 628, 632 (Tex. Crim. App. 2024).

[44] *Impersonation*, subheading *False Impersonation*, BLACK'S LAW DICTIONARY (12th ed. 2024).

[45] *Impersonation*, BLACK'S LAW DICTIONARY (5th ed. 1979).

that, to "impersonate" a public servant, the actor must at least have falsely represented himself to be a public servant.[46]  And when the actor is one type of public servant and is alleged to have impersonated a different type of public servant, the actor must have falsely represented himself to be the type of public servant that he is alleged to have impersonated.

Under that understanding of "impersonate," we conclude that the evidence falls short of showing it.  Jeter *truthfully* represented, at the outset of the interview, that he was a "cattle ranger."  He never claimed to be any other sort of public servant.  When Appellee suggested that the father of the boy he interacted with had said he would call the Texas Rangers, Jeter correctly stated that he was no longer with the Texas Rangers and that he was now a cattle ranger.

It is true that Jeter said he was a "police officer."  By that statement, it was clear that he was not claiming to be a municipal police officer[47] but was more

---

[46]   These definitions also suggest that the word "impersonate" implies at least some sort of mental culpability, though we need not decide here what that mental culpability is or whether it is subsumed or affected by the subsequent clause in the Texas statute, "with intent to induce another to submit to . . . pretended official authority."  *See* TEX. PENAL CODE § 37.11(a)(1); *see also Sanchez v. State*, 995 S.W.2d 677, 685 & n.7 (Tex. Crim. App. 1999) (suggesting that "intentional" culpable mental state can sometimes carry an implied "knowing" mental state for certain elements in a statute, depending on the context); *Ex parte Jones*,  625 S.W.3d 118, 122-23 (Tex. Crim. App. 2021) (Yeary, J., concurring) (same).

[47]   *See* TEX. CODE CRIM. PROC. art. 2.12(3); *see also id.* 2A.001(3).

generically identifying himself as law enforcement. Even assuming that his use of the word "police officer" corresponds to "peace officer" found in the Code of Criminal Procedure, he was in fact a "peace officer." Then Article 2.12 defined "peace officers" to include "rangers."[48] Chapter 411 of the Government Code refers to three types of rangers: Texas Rangers, special rangers, and special Texas Rangers.[49] Former Article 2.125 referred to an individual appointed under that statute as a "special ranger."[50] We are not aware of a statute that creates an officer that is merely a "ranger." Former Article 2.12 did not specify what type of ranger it meant, so it must plainly have encompassed all rangers, which includes the cattle rangers—special rangers under Article 2.125.

In addition, one of the categories of "peace officer" described by then Government Code section 411.199 as eligible to apply for a license after retirement was "a special ranger of the Texas and Southwestern Cattle Raisers Association appointed by the director under Article 2.125, Code of Criminal Procedure, who holds a certificate of authority issued by the director under that article and a peace

---

[48] *Id.* § 2.12(4); *see also id.* 2A.001(4).

[49] *See* TEX. GOV'T CODE §§ 411.021, 411.023, 411.024.

[50] *See* TEX. CODE CRIM. PROC. art. 2.125(a)-(f); *see also id.* art. 2A.006(b)-(f).

officer license issued by the Texas Commission on Law Enforcement."[51]

Moreover, a 2008 Texas Attorney General Opinion said that cattle rangers are peace officers, causing certain information about them to be excepted from public disclosure under the Open Records Act.[52] Also, old cases from this Court have suggested that a "special ranger" qualifies as a "peace officer."[53] And in bankruptcy proceedings, a federal district court has held that "TSCRA Special Rangers are 'peace officers'—in other words, they are local law enforcement with admittedly limited jurisdiction," making them proper recipients of report of a crime under a federal "safe harbor" provision.[54]

Nor can it be said that Jeter intended to induce another to submit to his "pretended official authority" by conducting an interview: his conduct of the

---

[51] *See* TEX. GOV'T CODE § 411.199 (LEXIS 2024); *see also id.* (LEXIS 2025) (replacing reference to Art. 2.125 with Art. 2A.006).

[52] Atty Gen. Op. No. OR2008-13269, 2008 Tex. AG Ltr. Rul. LEXIS 12508 (Sept. 29, 2008) ("You inform us the named individual is a peace officer under Article 2.125 of the Texas Code of Criminal Procedure. Accordingly, the city must withhold the responsive highlighted information under section 552.117(a)(2) of the Government Code.").

[53] *Trimble v. State*, 132 Tex. Crim. 236, 241 (1937) ("At most appellant was a special ranger, and as such would have only the right pertaining to any other peace officer similarly situated."); *Ringer v. State*, 33 Tex. Crim. 180, 180, 183 (1894) (The defendant was not a peace officer because he did not accept his appointment as a special ranger by reporting to the group to which he was assigned.).

[54] *Kerns v. First State Bank of Ben. Wheeler*, 667 B.R. 539, 544 & n.3 (E.D. Tex., Tyler Div. 2024).

interview was *not* an exercise of *authority*. At the suppression hearing, the trial court expressed "no doubt" that the interview was a "casual conversation." Thus, the trial court found that the interview was a *consensual* encounter, a finding that is amply supported by Jeter's testimony and the recording of the interview. Other statements by the trial court in the hearing and in the written findings expressed the conclusion that the interview was noncustodial and that Appellee's statements were voluntary, but the "casual conversation" remark shows that the trial court had in fact concluded that Jeter had not even conducted an investigative detention.[55]

"Police officers are as free as any other citizen to knock on someone's door and ask to talk with them."[56] "[N]o justification is required for an officer to request information from a citizen," and "citizens may, at will, terminate consensual encounters."[57] And an officer does not have to communicate to a citizen that his request for information may be ignored, and a citizen's

---

[55] And the court of appeals seemed to recognize that the interaction between Jeter and Appellee was a consensual encounter. *See Coleman*, 2024 WL 4643429, at *4 ("We have no quarrel with the State's general proposition that consensual encounters between citizens and police do not implicate Fourth Amendment protections. However, our inquiry does not end there . . .") (citation omitted).

[56] *State v. Garcia-Cantu*, 253 S.W.3d 236,243 (Tex. Crim. App. 2008).

[57] *State v. Woodard*, 341 S.W.3d 404, 411 (Tex. Crim. App. 2011).

acquiescence to such a request "does not cause the encounter to lose its consensual nature."[58]  Because the encounter was consensual, Jeter did not purport to exercise any authority by knocking on Appellee's door, asking to come in, and then asking Appellee questions.

For this reason, Jeter's conduct of the interview also did not amount to impersonation of a public servant under the *second* subdivision of the statute's codification of the offense because he did not "knowingly purport[] to exercise . . . any function of a public servant or of a public office" much less do so "without legal authority.[59]  Whether taking Appellee's phone violated the second subdivision might be a closer question, but we decline to address that question because the court of appeals's analysis focused on the interview, without even mentioning the phone,[60] and because the record seems to suggest that no evidence was obtained from the phone.

Having concluded that the court of appeals erred in finding that Jeter committed the crime of impersonation of a public servant when he was conducting

---

[58]  *Id.*

[59]  *See* TEX. PENAL CODE § 37.11(a)(2).

[60]  *See Coleman*, 2024 WL 4643429, at *5 (discussing statements made by Jeter during the interview but not mentioning the taking of Appellee's phone).

the interview, we reverse the judgment of the court of appeals and remand the case

for further proceedings consistent with this opinion.[61]

---

[61] The dissent claims that we do not disturb the court of appeals's holding that Appellee had standing to challenge the admission of his statement. The dissent is mistaken. The court of appeals found standing solely by virtue of the penal offense of impersonation of a public servant, *see supra* at part I.D., and we have overturned that holding. We have also recognized that, under current precedent, the trial court's articulated basis for relief—lack of authority—fails to confer standing. Contrary to the dissent's contention, this recognition is not a broad, unsupported holding; it is the holding in *Chavez*, which is not an issue currently before us. That holding appears to explain why the court of appeals decided to reach out to find a violation of the impersonation statute: it perceived lack of authority to be insufficient to confer standing and looked for another basis. And the dissent also overstates what the *Chavez* standing holding means and our recognition of it: no one is saying that lack of authority is never *relevant* to an issue of standing or cannot be a *component* of an issue of standing. Indeed, lack of authority is a component of an impersonation offense. The *Chavez* standing holding is merely that lack of authority is not *by itself* sufficient to confer standing. For this reason, the dissent's complaint about unauthorized traffic stops is off-base. For such a stop, one could point to a violation of the "unlawful restraint" statute, *see* TEX. PENAL CODE § 20.02, and if the officer pretends to have authority, to the second subdivision of the impersonation statute, *see supra* at n.41. The dissent accuses this Court of issuing an advisory opinion, but it is mistaken about that too, because the practical effect of our decision on the court of appeals's decision is obvious—the court of appeals has not articulated a proper basis for standing and will have to come up with another basis or reverse the trial court's suppression order. The dissent suggests that the court of appeals held that the trial court was authorized to grant the motion to suppress based on Jeter's purported lack of authority. Again, the dissent is mistaken. The State raised three claims on appeal, which the court of appeals grouped into two issues: standing and authority. *See Coleman*, 2024 WL 4643429, *3, 5. If the State won on either issue, it would prevail on appeal. If the State won on the authority issue, the trial court's purported basis for suppression would disappear. But the State was also taking the position that lack of authority did not confer standing, and if the State won on the standing issue, then it would still prevail, and so the court of appeals responded to the State's standing argument with its holding that Jeter violated the impersonation statute. The court of appeals's holding that Jeter lacked authority was merely a rejection of one of the State's two independent bases for relief. *See id.* at *8 (overruling issue three after having overruled the State's first two issues and then stating, "Having overruled *each* of the State's issues, we affirm the trial court's order granting Appellee's motion to suppress.") (emphasis added and removed). The dissent also complains about a number of other issues that might be implicated by the facts of this case, but need not be resolved to overturn the court of appeals's holding: whether Jeter committed one of the other penal offenses alleged by Appellee at trial, whether the impersonation-offense issue (or any of the alleged penal violations raised by Appellee at trial) was even law applicable to the case, and whether we should re-examine this Court's standing

Delivered: January 29, 2026

Publish

───────────────

jurisprudence requiring the statute violated to be related to a defendant's personal rights. Whether Jeter committed other criminal law violations and whether those alleged violations are law applicable to the case are issues the court of appeals can address on remand. (We note, however, that, to the extent some of the alleged violations would suggest that Jeter's *taking of the phone* was illegal, they would not support suppressing Appellee's statements (e.g. the theft allegation).) And of course, if Appellee loses in the court of appeals, he could raise in a petition for discretionary review whether we should re-examine our standing jurisprudence, and we could then decide whether to consider that question. The dissent also claims we should remand for further fact-finding, but there is no need to do so to resolve either of the bases for standing relied upon by the lower courts. Under current precedent, the trial court's lack-of-authority basis does not confer standing as a matter of law, and the court-of-appeals's impersonation basis is not supported by the record under the trial court's findings. On the latter issue, we note that the court of appeals's holding under subdivision (1) of the impersonation statute is not supported by the record, and no amount of factfinding would change that. As for subdivision (2) of the impersonation statute, the trial court made some oral and written findings in favor of the State that compel a conclusion that the encounter was consensual, and that conclusion plus the undisputed video evidence necessarily defeats impersonation with respect to the eliciting of Appellee's statements. Paradoxically, the dissent also suggests that the State should ultimately prevail on the suppression issue, but the dissent's proposed disposition of dismissing the petition as improvidently granted would not only leave the trial court's suppression order in place, but also give it the status of having been affirmed on appeal. The dissent suggests that the State could revisit suppression and raise the causation issue, but, aside from the fact that the trial court would have no incentive to revisit a suppression order that was affirmed on appeal, the court of appeals's holding that the evidence was obtained as a result of the crime of impersonation of a public servant would appear to foreclose a causation challenge.